(62 South. 485.)

No. 19,619.

## GUGEL v. CARSON.

(June 9, 1913.)

*(Syllabus by the Court.)*

FRAUDULENT CONVEYANCES (§ 95*)—TRANS-
FER OF PERSONALTY TO WIFE.

Where the husband, solvent at the time, caused certain shares of stock to be issued in the name of his wife, and certain bonds to be delivered to her, in payment of her parapher-nal claims against him, the wife acquired a title to the property, which cannot be inquired into by future creditors of the husband, represent-ed by a trustee in bankruptcy.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 243–288; Dec. Dig. § 95.*]

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by Andrew G. Gugel, trustee in bankruptcy, against Eliza Carson, wife of Brandt V. B. Dixon. Judgment for defend-ant, and plaintiff appeals. Affirmed.

Johnson & Fernandez, of New Orleans, for appellant. L. L. Labatt, Wm. A. Dixon, and Titche & Rogers, all of New Orleans, for appellee.

LAND, J. Plaintiff, as trustee of the bankrupt estate of Brandt V. B. Dixon, insti-tuted two suits against defendant to recover property alleged to belong to the community existing between the defendant and the bank-rupt.

In the first suit the plaintiff alleged that on August 12, 1908, Mrs. Dixon acquired 125 shares of stock of the Oakdale Improvement Company of the par value of $100 per share, which stock was issued in the name of the defendant, and of which she still held 105 shares at the date of the suit. In the sec-ond suit the plaintiff alleged that on Septem-ber 12, 1908, the defendant acquired by pur-chase 3½ lots of ground in the city of New Orleans.

In both suits the trustee alleged that the property belonged to the community and was subject to the debts of the bankrupt, and prayed that the defendant be ordered to de-liver possession of the same to the petitioner for administration as part of the estate of the bankrupt.

It appears that Dr. Dixon was adjudged a bankrupt in September, 1910, and that these two suits were filed early in the year 1912. It further appears that the discharge of Dr. Dixon was unsuccessfully opposed on the ground of fraud in not returning the property in question as a part of his bankrupt estate. It further appears that Dr. Dixon was solvent during the year 1908, and that his insolvency arose out of subsequent transactions.

Plaintiff alleges that the 125 shares of stock were issued in the name of Mrs. Dix-on, and that the real estate was purchased by her.

Our learned brother below states the sa-lient facts as follows:

"The facts, however, show that Mrs. Dixon inherited a considerable property, which was sold by her and the funds transmitted to her and her husband. It, however, was her money despite the fact that the drafts were under the law made payable jointly. The money was col-lected by the husband, deposited in his name, but at a subsequent date invested in a tract of land, known as the 'Donnerfelser tract.' This tract was subsequently, and at a time not sus-picious, transferred to the Verrett Canal Com-pany. The whole transaction being conducted by Dr. Dixon, at the instance, solicitation, and direction of his wife, he appearing as the agent and taking in her name the stocks and bonds issued by the canal company in exchange for the property Dr. Dixon had bought in his own name, with her money, and at her solicitation and direction."

"Subsequently the real estate was acquired by Mrs. Dixon by exchange for certain bonds which had resulted from the deal with the Ver-rett Canal Company."

The property referred to in the first para-graph of the above statement was situated in the city of St. Louis, Mo., and Mrs. Dixon owned a half interest therein, and the other interest was owned by her brother, Dr. Car-son, who had charge of the property.

Dr. Carson in his testimony gives a state-

ment of sundry amounts of money collected by him for account of Mrs. Dixon, and remitted to her from time to time. He specified remittances of $1,100, $2,300, and $5,300 from sales of real estate. The remittance of $5,300 was made in the latter part of December, 1904. Dr. Dixon testified that in January, 1905, he had on hand about $10,000 in cash belonging to his wife, and that at her special instance and request he invested about $8,000 of the amount and some of his own money in the purchase of an interest in the Donnerfelser tract of land, and that he also used a part of his wife's money in the prosecution of a sewerage and water contract in which he and Dr. Craighead were interested.

The Donnerfelser tract was sold to the Verrett Canal Company, in which both Dr. Craighead and Dr. Dixon were stockholders. Dr. Dixon received 116 shares of stock representing the money investment of himself and wife in the original purchase of the tract. The shares were issued in the name of Dr. Dixon. Dr. Craighead, at the instance of Dr. Dixon, transferred 40 of his shares to Mrs. Dixon.

The Verrett Canal Company sold out to the Oakdale Improvement Company, and thereupon a settlement was made between Dr. Dixon and his wife in which the latter agreed to accept 125 shares of the stock of said company and 15 bonds in payment of her paraphernal funds, which had been used by her husband in the purchase of the Donnerfelser tract and in the prosecution of the sewerage and water contract. The shares of stock were issued in the name of Mrs. Dixon, and the 15 bonds were delivered to her. The subsequent purchase of the lots sued for was merely an exchange of some of the shares and bonds of Mrs. Dixon for the property. Both Mrs. and Dr. Dixon testified that her money was intrusted to him as her agent for the purposes of investment. There is nothing

to contradict this testimony. Apart from the question of agency, it is clear from the evidence that Dr. Dixon invested a considerable amount of the separate funds of his wife in the purchase of the Donnerfelser tract and in the execution of the sewerage contract. By direction of Dr. Dixon the 125 shares of stock and 15 bonds were issued to his wife to replace her paraphernal funds which had been used by him. The transfer was authorized by the text of the law. Civil Code, art. 2446.

Mrs. Dixon has held the record title to the shares and lots in question ever since 1908. Proof that she acquired the same by a transfer from her husband, made for the purpose of replacing her paraphernal effects, makes her title good against the world. The plaintiff does not attack the title of Mrs. Dixon on the ground of fraud, simulation, or illegality, but merely relies on the prima facie presumption that purchases made during the marriage fall into the community. Dr. Dixon was solvent during the year 1908 and might have donated the shares of stock to his wife as far as *future* creditors were concerned. It is not shown that the plaintiff represents any person who was a creditor of Dr. Dixon in the year 1908. It is settled by codal law that a creditor cannot complain of *real* contracts, however fraudulent, made before the time his debt accrued. Civil Code, art. 1993. The same rule has been applied to fraudulent simulations. See Méché v. Lelamie, 30 La. Ann. 1136; Hebert v. Lége, 29 La. Ann. 513. The only exception to the rule is the rare case of a *simulated* contract made for the purpose of defrauding *future* creditors. The rule announced in Civil Code, art. 1993, has been applied to transfers from husband to wife. In Lewis v. Peterkin, 39 La. Ann. 783, 2 South. 578, the court said:

"As he was not a creditor of the husband at the date of the judgment of separation of property, he had no legal concern with its existence or validity, as he had no rights which could be jeopardized or affected thereby in the least."

The court cited authorities to the effect that, if the husband, in transferring property to his wife, intended the title to pass, the consideration did not concern future creditors, as the husband was, as to them, free to make his wife a donation of the property. In the case at bar there was a transfer for a valuable consideration and an actual delivery of the shares and bonds to the wife. The transaction was a giving in payment perfected by transfer of title to the wife on the books of the corporation, and the delivery to her of the shares and bonds. This transaction was made in good faith, and we cannot conceive how it worked any damage or injury to creditors, present or future.

Judgment affirmed.